**REINSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**ADMINISTRATIA ASIGURARILOR de STAT (ADMINISTRATION OF STATE INSURANCE), Defendant.**

No. 83 C 4682.

United States District Court, N.D. of Illinois, E.D.

Oct. 3, 1988.

---

518

Michael P. Connelly, Chadwell & Kayser, Ltd., Chicago, Ill., for plaintiff.

James R. Gannon, Paul V. Esposito, Lewis Overbeck Furman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This diversity case is before us on the defendant's motion to vacate judgment pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure and the plaintiff's motion to compel discovery. We deny both motions.

## I. MOTION TO VACATE
### FACTS

This dispute arises out of a complex reinsurance treaty signed by the plaintiff Reinsurance Company of America ("RCA") and CJV Associates ("CJV"), an agent of defendant Administratia Asigurarilor de Stat ("ADAS"). The facts relevant to this motion are as follows.

On January 19, 1983, RCA filed a complaint against ADAS in the Circuit Court of Cook County, alleging breach of the reinsurance treaty. ADAS then removed the case to federal court and filed its answer. ADAS's answer lists nine affirmative defenses, none of which mention the treaty's arbitration or liability limitation provisions. On April 17, 1985, we issued a memorandum opinion denying ADAS's motion to dismiss on comity grounds and granting partial summary judgment in favor of RCA as to CJV's status as an agent of ADAS. Because ADAS raised only the comity issue in its memoranda, we gave it until May 3, 1985 to file a supplemental memorandum in support of its other defenses.

ADAS failed to file a supplemental memorandum, and we granted summary judgment on liability in favor of RCA on July 9, 1985. However, we reserved ruling on the amount of damages pending further submissions by the parties. RCA submitted documents showing its damages, but again ADAS failed to submit anything. Therefore, on November 26, 1985, we granted summary judgment for RCA in the amount of $337,597.00.

ADAS filed a notice of appeal in this court on December 31, 1985, four days after the expiration of the period for filing such a notice under Rule 4(a)(1) of the Federal Rules of Appellate Procedure. We found that the deadline was missed because of the inexcusable neglect of ADAS and Mr. Radu Herescu, ADAS's then newly-hired attorney. *See* Memorandum Opinion of March 13, 1986. Consequently, we refused to extend the period within which ADAS could file its notice of appeal. The Seventh Circuit affirmed our decision and dismissed ADAS's appeal. *RCA v. ADAS*, 808 F.2d 1249 (7th Cir.1987).

On this motion, ADAS seeks to vacate the judgments entered on July 9, 1985 and November 26, 1985. As grounds for its motion, ADAS points to the behavior of its original attorney, Bernard Hubscher ("Hubscher"). According to Emil Boldus, an ADAS officer, the company retained Hubscher in March 1983.[1] Throughout 1983 and 1984, Boldus made "numerous" calls to Hubscher regarding this case and sent Hubscher several telexes requesting case status reports. At least two of the telexes reflect Boldus's frustration at Hubscher's failure to provide him promptly with information. In fact, Boldus stated in one telex: "Under [the] circumstances, we wonder whether you still work for us or not." Affidavit of Boldus at Exhibit E.

In addition to phone calls and telexes, Boldus met with Hubscher in New York on May 7, 1984. According to Boldus, though, "Hubscher ... failed to provide ADAS with meaningful advices [sic] respecting the status of the action [and] the nature

and viability of ADAS's defenses." *Id.* at ¶ 4. It is unclear how often Boldus contacted Hubscher after the May 7 meeting. However, the two met again approximately one year later on May 13, 1985, at which time "Hubscher advised [Boldus] that the suit was still in the discovery stage." *Id.* at ¶ 6. Hubscher never told Boldus about our April 17 opinion denying ADAS's motion to dismiss and granting partial summary judgment in favor of RCA.

Of course, by the time of the May 13, 1985 meeting with Boldus, Hubscher had already missed the deadline for filing a supplemental memorandum in opposition to RCA's motion for summary judgment. As noted above, Hubscher also failed to submit a memorandum on damages in July 1985. According to Boldus, Hubscher never informed him that anything had happened in the case during 1985, much less that an opinion, two orders, and final judgment had been entered. Boldus was allegedly unaware of the final judgment until December 2, 1985, when a business contact informed him of it. In December, Boldus called Hubscher several times, and each time Hubscher "assured ... [him] that there could be no judgment rendered against ADAS." *Id.* at ¶ 7. Also during December, Boldus contacted Herescu, who called Hubscher and received a similar response.

## DISCUSSION

ADAS asks that we vacate judgment under Rule 60(b)(6) because of Hubscher's "gross negligence." "The general rule in this circuit is that relief from a judgment under [R]ule 60(b) is an extraordinary remedy and is granted only in exceptional circumstances." *C.K.S. Engineers v White Mountain Gypsum*, 726 F.2d 1202, 1204–05 (7th Cir.1984). Mere negligence of counsel does not constitute such an "exceptional circumstance." However, courts differ as to whether an attorney's *gross* negligence may serve as grounds for Rule 60(b)(6) relief. *Compare L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234 (D.C.Cir.1964), *cert.*

---

1. Unbeknownst to ADAS, Hubscher retained local counsel, Mr. Terry Grimm of the Winston and Strawn law firm. We granted Mr. Grimm's motion to withdraw on February 26, 1986.

*denied,* 379 U.S. 824, 85 S.Ct. 50, 13 L.Ed.
2d 35 (1964) (yes) *with Shwarz v. U.S.,* 384
F.2d 833 (2d Cir.1967) (no). On two occasions, the Seventh Circuit has expressly
reserved ruling on this question. *Ben Sager Chemicals International v. E. Targosz
& Co.,* 560 F.2d 805, 810 (7th Cir.1977);
*Inryco v. Metropolitan Engineering Co.,*
708 F.2d 1225, 1234 (7th Cir.), *cert. denied,*
464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313
(1983).

In our view, gross negligence of
counsel does not justify relief under Rule
60(b)(6) for three reasons. First, permitting relief is "inconsistent with our system
of representative litigation, in which each
party is deemed bound by the acts of his
lawyer-agent." *Link v. Wabash R.R.,* 370
U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d
734 (1962). Second, all the parties have a
powerful interest in maintaining the finality of judgments. While Rule 60(b) by its
terms envisions exceptions to the rule that
judgments are final, we believe that adopting as uncertain a standard as "gross negligence" risks unwarranted erosion of the
rule. Third, in cases of attorney misconduct, the client's proper remedy should lie
with the true wrongdoer, the attorney, and
not with the innocent party-opponent who
relied upon the court decision. Therefore,
we hold that ADAS cannot seek Rule
60(b)(6) relief on the basis of Hubscher's
allegedly gross negligence.

However, even if we adopted the
gross negligence standard, we believe that
ADAS probably could not obtain relief on
the facts of this case. The Seventh Circuit
has stated that "courts allowing ... relief
[for attorney gross negligence] uniformly
require a diligent, conscientious client."
*Inryco,* 708 F.2d at 1234. Between May 7,
1984 and December, 1985, it is unclear
what communication took place between
ADAS and Hubscher, with the exception of
the Hubscher–Boldus meeting on May 15,
1985. We cannot say that Boldus's simple
inquiry into the status of the case at this
one meeting reflects sufficient diligence on
the part of ADAS, especially in light of
Hubscher's earlier failure to respond to
ADAS's inquiries.

To summarize, we hold that ADAS cannot obtain Rule 60(b)(6) relief on the basis
of attorney Hubscher's alleged misconduct.
By our decision, though, we do not intend
to intimate our approval of Hubscher's behavior which, if correctly characterized by
ADAS, was outrageous and worthy of substantial disciplinary sanctions. Nor do we
suggest that this is necessarily the end of
the road for ADAS. "[A] remedy for an
attorney's professional negligence is a suit
for malpractice." *Inryco,* 708 F.2d at 1235.

## II. MOTION TO COMPEL DISCOVERY

### FACTS

On October 27, 1986, RCA served ADAS
with several post-judgment interrogatories
pursuant to Rule 69. On January 30, 1987,
ADAS sent answers to all but three of the
interrogatories. ADAS objects to Interrogatory 2 ("... information relative to persons, partnerships and corporations domiciled in the United States which are insured
or reinsured by ADAS and which have exposures in the U.S., Canada or United
Kingdom."); Interrogatory 6 ("... information relative to any reinsurance agreements ADAS has with any ceding companies located in the U.S., Canada or United
Kingdom pursuant to which funds held by
such ceding companies earn interest which
is ultimately payable to ADAS."); and Interrogatory 9 ("... information relative to
whether ADAS has accepted any reinsurance submissions from brokers or agents
located in the United Kingdom who [sic]
ADAS knows or believed receives business
offerings from reinsurance brokers located
in the United States and/or Canada.").

ADAS objects to these three interrogatories because responding to them would allegedly violate Romanian law. In support
of its position, ADAS points to two provisions of Romanian law defining "state secrets" and "service secrets," as well as a
companion criminal statute proscribing release of such secrets:

Art. 2. *It is considered State secret*
according to the stipulations of the Penal
Code, any information data and documents which evidently show this character as well as those declared and quali-

fied as such by a Council of Ministers decision.

The transmission or divulging of information data and documents which constitute State secrets, loss, detaining outside Service duties, distruction [sic], alteration or taking away of documents with such character negligence which led to one of these facts or which enabled other person to take possession of information data or documents *which might endanger the economic, technical-scientific military or political interests of the State* as well as other infringement of the norms regarding the protection of the State secret, constitute unusual grave facts and are punished by the penal law.

.   .   .   .   .

Art. 4.   The information, data and documents which according to the present law do not constitute State secrets but *are not destined to publicity are Service secrets and cannot be divulged.*

.   .   .   .   .

Art. 251.   The divulgement of the State secret, if this does not constitute infringement of art. 169, and also *the divulgement of data or information which, although does not constitute State secrets are not destined to publicity, if the act is of the nature to affect public interest, are punished by imprisonment from 6 months to 5 years.*

Affidavit of Dumitriu at Exhibits 1 and 2 (emphasis added) ("Secrets Law"). Further, ADAS submits the affidavit of Dan–Andrei Dumitriu, a Romanian attorney. Mr. Dumitriu states that in his opinion, "[t]he disclosure of the information requested by the Plaintiff under Interrogatory 2, 6 and 9 is strictly prohibited by [the Secrets Law] as the disclosure of a Service Secret which may endanger the economic and political interests of Romania." Affidavit of Dumitriu at ¶ 6. He also attests that "based on [his] experience, [he] believes that [the Secrets Law] has been and will be vigorously enforced in Romania." *Id.* at ¶ 10.

## DISCUSSION

The parties agree that Section 40 of the Restatement (Second) of Foreign Relations Law of the United States (1965) applies. Section 40 provides:

§ 40.   Limitations on Exercise of Enforcement Jurisdiction Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Restatement (Second) of Foreign Relations § 40, *quoted with approval in United States v. First National Bank of Chicago,* 699 F.2d 341, 345 (7th Cir.1983).

█   The first step is to determine whether an order compelling response to RCA's interrogatories "would require inconsistent conduct upon the part of" ADAS or its employees. Although the provisions of Romanian law cited by ADAS are ambiguous in some respects, all of the evidence before the court explicating Romanian law, *i.e.* the Dumitriu affidavit, points toward finding that ADAS financial information is a "service secret" which cannot be released. Therefore, on the basis of the evidence before us, we conclude that compelling response to the RCA interrogatories would violate Romanian law.

█   Next, we apply the five factors of Section 40. However, we bear in mind that "[t]he fact that foreign laws may subject a person to criminal sanctions in the foreign country if he produces certain information

does not bar a domestic court from compelling production." *Id.* at 345. We discuss each of the five factors in turn.

*Vital Interests.* Contrary to ADAS's suggestion, the United States has a significant interest in this case. Our government has a considerable interest in providing a meaningful forum to its citizens in commercial disputes with foreigners. *See* 28 U.S.C. § 1332. An important element of that forum is sufficient discovery. *See Compagnie Francaise D'Assurance v. Phillips Petroleum,* 105 F.R.D. 16, 30 (S.D.N.Y. 1984).

On the other hand, Romania has a substantial interest in prohibiting the release of what it regards as secret information. Importantly, there is no indication that the Secrets Law "was intended to provide" Romanian citizens "with tactical weapons and bargaining chips in foreign courts," as was the case with the French blocking statute in *Compagnie Francaise D'Assurance.* Though it is a close call, we find that the Romanian interest in protecting its important secrets outweighs the American interest in providing full discovery.

*Hardship.* This factor weighs in favor of ADAS because its employees would be exposed to criminal sanctions for producing the information requested by RCA.

*Location of Conduct.* RCA argues that ADAS could respond to the interrogatories outside of Romania. It is certainly true that ADAS could physically deliver the interrogatory responses outside Romania. However, because ADAS has offices only in Romania, it is difficult to see how ADAS could assemble the required financial information anywhere but in Romania. Thus a significant part, and perhaps the bulk, of ADAS's compliance with RCA's interrogatories will take place in Romania. Consequently, we believe this factor leans slightly toward ADAS.

*Nationality.* ADAS is Romanian.

*Enforcement.* The only evidence before the court on this factor is Mr. Dumitriu's affidavit in which he states that the Secrets Law is "vigorously enforced." Dumitriu Affidavit at ¶ 10. Though Dumitriu's affidavit is hardly overwhelming, it is suffi-cient. Therefore, this final factor weighs in favor of ADAS.

As all five factors (albeit some to lesser degrees) lean in favor of ADAS and the application of Romanian law, we hold that Section 40 prevents us from requiring ADAS to answer Interrogatories 2, 6, and 9.

## CONCLUSION

We deny ADAS's motion to vacate the judgment and deny RCA's motion to compel discovery.