**REINSURANCE COMPANY OF AMERICA, INC.,**
Plaintiff–Appellee/Cross–Appellant,

v.

**ADMINISTRATIA ASIGURARILOR de STAT (ADMINISTRATION OF STATE INSURANCE),** Defendant–Appellant/Cross–Appellee.

Nos. 88–3142, 88–3208.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1989.

Decided May 25, 1990.

**1276**

Bernard Hubscher, New York City, John R. Ostojic, Michael P. Connelly, Jack Mustes, Connelly, Mustes, Palmer & Schroeder, Chicago, Ill., for plaintiff-appellee.

Paul V. Esposito, James R. Gannon, Lewis, Overbeck & Furman, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

BAUER, Chief Judge.

Defendant-appellant Administratia Asigurarilor de Stat (ADAS), an insurance corporation wholly owned by the Romanian government, appeals from the district court's denial of its motion under Fed.R. Civ.P. 60(b)(6) to vacate the court's entry of summary judgment against it. 122 F.R.D. 517. ADAS contends that the court abused its discretion in denying this motion and that the gross negligence of its counsel in the underlying action justifies relief from judgment. Plaintiff-appellee Reinsurance Company of America (RCA), an Illinois corporation engaged in the reinsurance business, cross-appeals asserting that the district court's denial of its request for post-judgment interrogatories was likewise an abuse of discretion. We find no abuse of

discretion by the district court in either instance and therefore affirm.

## I.

The parties and this court are both painfully familiar with the rather tangled facts of this case; *See Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat*, 808 F.2d 1249, 1250–51 (7th Cir.1987) (*ADAS I*). With the hope of imposing some degree of clarity on this bramble of accusations, we will, once again, attempt to summarize the dispute.

Plaintiff and defendant entered into two Quota Share Retrocession Agreements, effective October 1, 1977, and January 1, 1980, respectively. Under the terms of the contract, ADAS agreed to participate as a retrocessionaire for risks which were reinsured by RCA. The contract was executed by representatives of RCA and CJV Associates (CJV) which acted as agents for ADAS. On January 19, 1983, RCA sued ADAS in the Circuit Court of Cook County for breach of these retrocession agreements. ADAS removed the case to federal court on July 8, 1983, and filed an answer to the complaint on July 20. In the answer, ADAS set forth nine affirmative defenses. On February 28, 1984, ADAS filed a motion to dismiss based upon a Romanian judgment which had declared the contracts void. On that same date, RCA filed a motion for summary judgment on the issue of liability.

The district court, on April 15, 1985, partially granted RCA's motion for summary judgment and denied ADAS's motion to dismiss. Chief Judge Grady stated that because the Romanian court lacked jurisdiction over RCA, he would not recognize the judgment voiding the contracts. Further, in partially granting RCA's motion for summary judgment, Chief Judge Grady held that CJV was an agent empowered to enter into an agreement on behalf of ADAS. ADAS then was instructed to file supplemental memoranda offering additional defenses by May 3, 1985. It failed to do so. On July 9, 1985, the district court granted summary judgment on liability for RCA. Following submission of additional

evidence by RCA (ADAS again failed to provide any materials), the district granted summary judgment for RCA on November 26, 1985, and awarded damages in the amount of $337,597.00.

ADAS subsequently filed a notice of appeal on December 31, 1985, four days after the expiration of the period for filing such a notice. *See* Fed.R.App.Pro. 4(a)(1). The court refused to extend the deadline citing the inexcusable neglect of ADAS and Mr. Radu Herescu, ADAS's then newly-hired attorney, as grounds for the refusal. On appeal, we affirmed that decision. *ADAS I,* 808 F.2d 1249 (7th Cir.1987). ADAS then filed a motion under Fed.R.Civ.Pro. 60(b)(6) to vacate the judgment based on the gross negligence and intentional deceit of its former counsel, Mr. John Hubscher. On October 3, 1988, the district court denied defendant's motion. Judge Grady wrote that an attorney's gross negligence is not a basis for relief under Rule 60(b)(6). The court held in the alternative that even assuming such a standard was proper, ADAS had not exercised sufficient diligence during the litigation to allow it to recover under a gross negligence standard.

Chief Judge Grady's order of October 3, 1988, also disposed of a request by RCA to order certain post-judgment interrogatories. ADAS had objected to RCA's inquiries as violating Romanian law prohibiting disclosure of state secrets. RCA then sought a motion to compel responses. In its order of October 3, 1988, the district court denied RCA's motion to compel indicating that the balance of the interests weighed in favor of Romania's laws protecting national secrecy. Both sides now appeal from those portions of this order with which they disagree.

## II.

Federal Rule of Civil Procedure 60(b) provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; (6) any other reason justifying relief from the operation of the judgment.

ADAS contends that the "gross negligence" and misrepresentations by its attorney justify relief from judgment under Fed.R.Civ.Pro. 60(b)(6), the catch-all provision. For the following reasons, we disagree. At the outset, however, we must note that our review on this appeal is a most limited one. Relief from judgment under Rule 60(b) may be granted at the broad discretion of the trial judge, *Lomas and Nettleton v. Wiseley,* 884 F.2d 965, 967 (7th Cir.1989), and the court's determination may only be reversed upon an abuse of that discretion. *Williams v. Hatcher,* 890 F.2d 993 (7th Cir.1989). We note further that "abuse of discretion in denying a 60(b) motion is established only when no reasonable person could agree with the district court; there is no abuse of discretion if a reasonable person could disagree as to the propriety of the court's action." *McKnight v. United States Steel Corp.,* 726 F.2d 333, 335 (7th Cir.1984). Along with this narrow scope of review, we have stated that "the general rule in this circuit is that relief from a judgment under [R]ule 60(b) is an extraordinary remedy and is granted only in exceptional circumstances." *C.K.S. Engineers v. White Mountain Gypsum,* 726 F.2d 1202, 1204–05 (7th Cir.1984).

ADAS argues that the gross negligence of its counsel, Mr. John Hubscher, created such an exceptional circumstance and, therefore, justifies an extreme remedy. In support of this claim, ADAS contends that Hubscher did not disclose important facts despite repeated inquiries from

the company. Particularly, Hubscher never informed ADAS of the court's ruling of April 15, 1985, denying defendant's motion to dismiss and partially granting plaintiff's motion for summary judgment. Moreover, after the April 15, 1985 order, Hubscher repeatedly failed to provide the court with documents and materials, or to make appearances, necessary for ADAS' defense.

Despite appellant's contentions, this court has never held that an attorney's gross negligence justifies relief under Rule 60(b). *Coleman v. Smith*, 814 F.2d 1142 (7th Cir.1987); *Inryco, Inc. v. Metropolitan Engineering Co., Inc.*, 708 F.2d 1225 (7th Cir.1983); *Ben Sager Chemicals International, Inc. v. E. Targosz & Co.*, 560 F.2d 805, 809 (7th Cir.1977). At least two circuits have adopted such a rule, *see Boughner v. Secretary of Health, Education and Welfare*, 572 F.2d 976 (3rd Cir. 1978) (attorney "neglect so gross that it was inexcusable [and] sufficiently exceptional and extraordinary so as to mandate relief"); *L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234 (D.C.Cir.1964) ("[Rule 60(b)] permit(s) relief when as in this case personal problems of counsel cause him to grossly neglect a diligent client's case and mislead the client."). The Seventh Circuit, however, has declined to do so. *See Coleman v. Smith*, 814 F.2d at 1147; *Inryco*, 708 F.2d at 1234.

Whatever the relative merits of these two views, we need not choose between them today. Regardless of the conduct of Hubscher, ADAS simply did not demonstrate the diligence necessary to establish "extraordinary circumstances" sufficient to invoke Rule 60(b). As the district court noted, from May of 1984 until ADAS learned of the adverse judgment on December 2, 1985, there was apparently only one meeting between client and attorney. ADAS did not inquire about the status of

its case for over a year and a half. Despite Hubscher's alleged refusals to respond to their calls and telexes from July 5, 1983 through May 7, 1985, officials of ADAS refused to make any additional efforts to obtain information about their litigation. We must demand a higher standard than this of parties before our courts.

ADAS is a corporation involved in the highly technical, complex business of reinsurance. Its officers are bilingual, well-educated and well-travelled. We do not ask too much by demanding that they stay abreast of a lawsuit intimately involving their business. They failed to do so. Therefore, because of its lack of diligence in following the course of this case, ADAS is precluded from demanding Rule 60(b) relief due to the negligence of its attorney. We reserve for another day the question of whether a *diligent* client is entitled to relief under Rule 60(b) for the gross negligence of counsel. Today, we merely note that far more compelling circumstances than these will be required to drag us into that thicket.[1]

Finally, we also note, as did the district court, our deep concern over the alleged conduct of Mr. Hubscher. If the allegations made by ADAS are true, Hubscher's actions, or more correctly inactions, are reprehensible and demand redress. We underscore our statement in *Inryco*, "the remedy for an attorney's professional negligence is a suit for malpractice." 708 F.2d at 1235. *See also Daniels v. Brennan*, 887 F.2d 783, 788 (7th Cir.1989).

### III.

RCA contends, on cross-appeal, that the district court abused its discretion by denying its request for post-judgment interrogatories. RCA, in an effort to collect its damage award, filed a series of these inter-

---

1. Our recent holding in *Daniels v. Brennan*, 887 F.2d 783 (7th Cir.1989), however, indicates our skepticism about embarking on such a course. In *Daniels* we were asked to review a dismissal for want of prosecution in a civil rights case. Plaintiff's attorney had repeatedly failed to appear on behalf of his client, and had been warned by the district court of the possibility of dismissal of the action. Finally, the court, faced with more dilatory conduct, dismissed the action *sua sponte*. On appeal we affirmed this dismissal, noting "[t]he remedy for a client who suffers a dismissal because of the negligence of his attorney is a malpractice action;" 887 F.2d at 788. While *Daniels* did not directly involve a Rule 60(b) gross negligence claim, it does indicate our general dissatisfaction with such arguments.

rogatories with the district court on October 27, 1986. ADAS refused to responded to three of these inquiries. Each of the interrogatories in controversy asked ADAS to provide information regarding insurance contracts with firms in the United States, Canada and the United Kingdom.[2] In explaining this refusal to furnish a response, ADAS claimed that Romanian law forbade disclosure of the requested information.[3] Judge Grady denied RCA's motion to compel responses to the three disputed interrogatories. Because we agree with this decision, we affirm.

■ When the laws of the United States and those of a foreign country are in conflict, as they are here, this circuit, along with several others, has employed a balancing test derived from Section 40, Restatement (Second) Foreign Relations Law of the United States (1965) ("Section 40"). *See United States v. First National Bank of Chicago,* 699 F.2d 341, 345 (7th Cir. 1983); *see also United States v. Rubin,* 836 F.2d 1096, 1101 & n. 8 (8th Cir.1988); *United States v. Davis,* 767 F.2d 1025, 1034–35 (2nd Cir.1985); *In re Grand Jury Proceedings Bank of Nova Scotia,* 740 F.2d 817, 827–29 (11th Cir.1984); *United States v. Vetco,* 691 F.2d 1281, 1288–91 (9th Cir.1981). Section 40 provides:

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction in light of such factors as

2. Specifically, ADAS objected to interrogatories 2, 6, and 9. These interrogatories provided:

  2. For each and every person, partnership or corporation maintaining a residence or which is domiciled in the United States, which is insured or reinsured by ADAS and which has exposures in the United States, Canada and/or the United Kingdom, identify the following:

  (a) The name and address of the insured or reinsured;

  (b) The policy treaty or facultative certificates which provide the coverage; and

  (c) The policy limit for each coverage in U.S. dollars.

  6. State whether ADAS has in force any reinsurance agreements with any ceding companies located in the United States, Canada and/or the United Kingdom, pursuant to which funds held by such ceding companies earn interest which is ultimately payable to ADAS, and if so, identify for each:

  (a) The name of the ceding company;

  (b) The business address of the ceding company;

  (c) The date on which each agreement was entered into; and

  (d) The termination date, if any, for each agreement.

  9. State whether ADAS has accepted reinsurance submissions from brokers or agents located in the United Kingdom who ADAS knows or believes receives business offerings from reinsurance brokers located in the United States and/or Canada, and if so, state:

  (a) Whether the United Kingdom brokers or agents issue cover-notes or other formal evidence of coverage on behalf of ADAS;

  (b) Whether the United Kingdom brokers or agents collect premiums which are ultimately due to ADAS, and if so;

  (c) Identify the brokers, agents or companies located in the United States and Canada who remit such premiums, and provide their business addresses.

3. ADAS particularly raises two points of Romanian law defining "state secrets" and "service secrets." A rough translation of the relevant law, as quoted by the district court, provides:

  Art. 2. It is considered State secret according to the stipulations of the Penal Code, any information data and documents which evidently show this character as well as those declared and qualified as such by a Council of Ministers decision.

  The transmission or divulging of information data and documents which constitute State secrets, loss, detained outside Service duties, distruction [sic] alteration or taking away of documents with such character negligence which led to one of these facts or which enabled other persons to take possession of information data or documents which might endanger the economic, technical-scientific military or political interests of the State as well as other infringement of the norms regarding the protection of the State secret, constitute unusually grave facts and are punished by penal law.

  Art. 4. The information, data and documents which according to the present law do not constitute State secrets but are not destined to publicity are Service secrets and cannot be divulged.

  Art. 251. The divulgement of the State secret, if this does not constitute infringement of art. 169, and also the divulgement of data or information which, although it does not constitute State secrets are not destined to publicity, if the act is of the nature to affect public interest, are punished by imprisonment from 6 months to 5 years.

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Applying this test, Judge Grady determined that because Romanian law considered the requested information a "service secret" and punished disclosure with criminal sanctions, and the law was apparently vigorously enforced, the balance favored ADAS's refusal to respond to the interrogatories over RCA's right to such responses. As the following discussion of the Section 40 factors demonstrates, Judge Grady's conclusion is correct.

Initially, we must balance the "vital national interests" of both the United States and Romania. We approach this task with some misgivings. As Judge Marshall of the Northern District of Illinois noted, "the judiciary has little expertise, or perhaps even authority to evaluate the economic and social policies of a foreign country." *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1148 (N.D.Ill.1979). Moreover, when allegedly considering only "vital national interests," we are left with the rather ridiculous assignment of determining which competing national interest is the more vital.

Whatever the semantic difficulties of our test, the courts of the United States undoubtedly have a vital interest in providing a forum for the final resolution of disputes and for enforcing these judgments. This rather general interest, however, is not as compelling as those interests implicated in other Section 40 cases cited by RCA. For instance, in *Graco, Inc v. Kremlin, Inc.*, 101 F.R.D. 503 (N.D.Ill.1984), the court held that the United States had a compelling interest in ensuring that its patent laws were not undermined by a French blocking statute. Similarly, vital interests are involved when a commercial dispute implicates the integrity of American antitrust laws, *see e.g. In re Uranium Antitrust Litigation*, 480 F.Supp. at 1149. When the United States itself is a party in the litigation, the national interest involved may become compelling. Thus, enforcement of the tax laws, *Vetco*, 691 F.2d at 1332, and security laws, *SEC v. Banca della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y.1981), have been considered compelling national interests. In the case at hand, though, we are presented with a private dispute between two reinsurance corporations. The disputed materials are the subject of a post-judgment interrogatory request and not vital to the case-in-chief. While there is unquestionably a vital national interest in protecting the finality of judgments and meaningfully enforcing these decisions, this interest alone does not rise to the level of those found in these earlier cases.

Against this, we must weigh on the opposing side of the balance the Romanian interest in protecting its state and so-called "service" secrets. Given the scope of its protective laws and the strict penalties it imposes for any violation, Romania places a high price on this secrecy. Unlike a blocking statute, Romania's law appears to be directed at domestic affairs rather than merely protecting Romanian corporations from foreign discovery requests. *Cf. Compagnie Francaise D'Assurance v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984) (French blocking statute "never expected nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts."); *Graco*, 101 F.R.D. at 508 ("The Blocking Statute obviously is a manifestation of French displeasure with American pre-trial discovery procedures."). Given this choice between the relative interests of Romania in its national secrecy and the American interest in enforcing its judicial decisions, we have determined that Romania's, at least on the facts before us, appears to be the

more immediate and compelling.[4]

The remaining factors are far less problematic. In evaluating the extent and nature of the hardship imposed upon ADAS by inconsistent enforcement actions, Section 40(b), our sole reference is the affidavit provided by Mr. Dumitriu, a Romanian attorney. Mr. Dumitriu states that the officers of ADAS would face criminal sanctions for revealing "service" secrets as classified by the Romanian government. Moreover, Dumitriu's affidavit states that the law protecting state and "service" secrets is vigorously enforced, thus, satisfying the factor under Section 40(e). RCA contends that Section 40(c), the extent to which the required conduct is to take place in the territory of the foreign state, was mismeasured by the district court. We disagree. All the information which plaintiff sought through these interrogatories is located within Romania. The offices of ADAS are located within Romania as well. Any responses to RCA's interrogatories would have to be prepared in Romania using this information. Obviously, ADAS could deliver this material to a site in the United States and prepare some of the responses there, as plaintiff contends. Yet, this does not affect the very real threat faced by officials at ADAS who would have to remove this information from Romania. Finally, it is undisputed that Section 40(d), the consideration of the nationality of the person in question, weighs in favor of ADAS. This is a Romanian corporation whose offices are located only within that country. Those persons forced to comply with this discovery order would be Romanian citizens subject to the criminal sanctions of the law protecting state secrets. Thus, considering all five factors provided under Section 40—the competing national interests involved, the hardship to ADAS of compliance, the place of

compliance, the nationality of ADAS and the likelihood of enforcement of the criminal sanctions—we conclude that on balance the district court correctly denied RCA's motion to compel responses to the interrogatories.

■ Complicating our determination, however, is the recent publication of the Restatement (Third) of the Foreign Relations Law of the United States. We noted in our decision in *First National Bank*, 699 F.2d 341 (7th Cir.1983), that a new draft was pending, and now we must review our precedent in light of this new standard. Section 442 of the Third Restatement considers the specific problem of conflicting jurisdiction over discovery. The new section provides:

Requests for Disclosure: Law of the United States

(1)(a) A court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States.

(b) Failure to comply with an order to produce information may subject a person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim of defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party.

(c) In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency of the United States should take into account the importance to the investigation or litigation of the

---

**4.** We pause to note that between the argument of this case and this decision, there has been a profound and much celebrated change in the political structure of Romania. The high priority which national secrecy enjoyed under the old regime is presumably no longer in vogue. Neither plaintiff nor defendant, however, has brought supplemental information to this court regarding this matter. Thus, we must decide

this case on the facts before us. Should the parties believe that new facts have materially altered the foundation of our judgment, they are free to resubmit their claims. We note, however, that relevant changes in *the law* must be presented to the court rather than illusory changes in the political climate which provide little basis for re-evaluating this decision.

documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which non-compliance with the request would undermine important interests of the state where the information is located.

Thus the new Section 442 follows the path announced by this court in *First National Bank of Chicago* that "[t]he fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." 699 F.2d at 345. *See also In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 563 F.2d 992, 997 (10th Cir.1977). The new Section 442 provides a modified balancing test substantially similar to that of *First National Bank of Chicago* and Section 40. Although there are certain differences in emphasis, the factors to be considered remain largely synonymous and do not alter our determination that the district court's judgment was reasonable and correct. *See In re Grand Jury Proceedings, Yanagihara Grand Jury*, 709 F.Supp. 192, 196 n. 6 (C.D.Cal.1989) ("revisions [in Section 40] are immaterial for issues before the court, and thus do not alter the comity analysis.").

Section 442, however, does make one significant change to the old standard by introducing an element of good faith to be included at the court's discretion. The new language provides in part:

> (2) If disclosure of information located outside the United States is prohibited by law, regulation, or order of a court or other authority of the state in which the information is located, ...
>
> > (a) a court or agency of the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available[.]

Thus, at its discretion, the district court may require a good faith effort from the parties to seek a waiver of any blocking provisions. For example, the Eleventh Circuit held that a bank must comply with a grand jury subpoena and produce records located in the Bahamas despite alleged conflict with a Bahamian bank secrecy rule. *United States v. Bank of Nova Scotia I*, 691 F.2d 1384 (11th Cir.1982). The court held that, because the bank had not made a good faith effort to obtain the approval of the Bahamian authorities, and because there was no realistic threat of enforcement of the rule, the bank could not refuse to comply with the subpoena. *Id.* at 1388–89. Similarly, in *United States v. First National Bank of Chicago*, this court remanded a case to the Northern District of Illinois in order to determine whether First Chicago must make a good faith effort to receive permission from the Greek authorities to produce bank information located in Greece but unavailable due to the bank secrecy provisions of Greek law. 699 F.2d at 346–47.

Here, the district court did not discuss the question of a good faith effort by ADAS to seek a waiver of Romania's secrecy laws. Given, our holding in *First National Bank of Chicago*, we could remand this case for additional consideration of this issue. However, such a step is unnecessary. Our earlier case is easily distinguishable from the one at hand. In *First National Bank of Chicago*, the Greek law at issue appeared to provide a limited exception for furnishing certain information. Thus, it was unclear whether compliance would have resulted in criminal sanctions. *Id.* at 346. Moreover, a treaty existed between the United States and Greece for the purposes of diplomatically resolving such banking disputes. *Id.* Given this welter of uncertainty, there appeared at least the possibility of obtaining permission from the Greek authorities if First Chicago made a good faith effort.

By contrast, here, the law is apparently strictly applied. There are no exceptions to Romania's secrecy law. There exists no treaty between these governments to diplomatically resolve such problems. Unlike both *First National Bank of Chicago* and *Nova Scotia*, there would be little purpose to requiring a good faith effort to comply

with the discovery request. Therefore, the district court's decision not to impose a requirement of a good faith effort upon ADAS was reasonable. The denial of RCA's motion to compel responses was consistent with our prior holdings as well as the new standard under Restatement (Third) § 442 and not an abuse of discretion.

### IV.

The district court did not abuse its discretion either by denying ADAS's 60(b)(6) motion or RCA's motion for postjudgment interrogatories. Given ADAS's lack of attention to the progress of its case, it cannot seek relief from judgment due to the alleged "gross negligence" of its chosen counsel. Beyond this, the court properly considered the relevant factors under Section 40 and determined that the interests of the Romanian government outweighed those of the United States and that the potential hardship to ADAS tipped the balance against asserting jurisdiction. Thus, RCA's motion to compel responses to certain post-judgment interrogatories was properly denied. Moreover, upon reviewing the facts before us, we find that the district court was within its discretion in not requiring ADAS to make a good faith effort to seek a waiver of the applicable Romanian law. Therefore, for the foregoing reasons, the decision of the district court is

Affirmed.

EASTERBROOK, Circuit Judge, concurring.

Events have overtaken this case. Romania adopted a strict code of secrecy out of fear that sunlight would jeopardize the regime. Under Romanian law, anything that is not a "State secret" is a "Service secret" —in other words, *everything* is a secret. The regime fell nonetheless, and not because of loose lips. Revolution in Romania means that yesterday's secrecy laws are of little moment. What the Securitate kept under covers, its successors broadcast.

We have not heard from Romania's lawyer, perhaps because he has no idea who speaks for his client. I therefore join the court's opinion, which observes that the plaintiff may return to the district court for a fresh decision under contemporary law. The court applies a balancing approach that the parties agree is apt. Given this agreement, we have no occasion to decide whether to follow the *Restatement (3d) of Foreign Relations* § 442 (1987), to the extent we may create a federal common law of privileges.

If we were free of the parties' agreement, I would be most reluctant to accept an approach that calls on the district judge to throw a heap of factors on a table and then slice and dice to taste. Although it is easy to identify many relevant considerations, as the ALI's *Restatement* does, a court's job is to reach judgments on the basis of rules of law rather than to use a different recipe for each meal.

Two sources of law dominate here. The first is Fed.R.Evid. 501, which says that when state law supplies the rule of decision (as Illinois law does in this case), it also supplies the law with respect to privileges. Fed.R.Civ.P. 69, which governs this enforcement action, also directs the court to follow state law. Does (would?) Illinois follow the *Restatement of Foreign Relations* in deciding whether documents held abroad are privileged? The parties do not discuss the question.

The other rules come from the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11. Defendant in this case ("AAS"), an arm of the Romanian government, is open to suit under § 1605(a)(2) because the claim is based on its commercial activity within the United States. With a default judgment in hand, plaintiff seeks to discover AAS's assets. AAS invokes Romania's secrecy laws, which forbid it to disclose any information in its hands, even information about assets located outside Romania. Their effect is that no judgment against Romania may be collected. I doubt that general interest-balancing principles of the sort discussed in the *Restatement* may countermand the decision of Congress that courts of the United States may impose liability. The FSIA provides that a prevail-

ing party may execute against the foreign government's assets except to the extent the statute creates exceptions, see §§ 1609–11. This catalog of what is, and is not, available to satisfy a judgment eclipses any attempt by the foreign defendant to create its preferred list by using its domestic secrecy law. If we allow foreign states to exempt themselves after the fashion of (the old) Romania, we might as well forget about the FSIA.

Even the *Restatement* is no longer as favorable to foreign defendants as it once was. The catalog of relevant interests in § 442(1)(c) of the *Third Restatement* is not to be used generally to assess demands for information. It is designed to inform the discretionary decision whether to impose one of the sanctions mentioned in Fed.R. Civ.P. 37 and § 442(1)(b), such as contempt of court or a default judgment. As a rule, parties are entitled to seek information and, *without regard to balancing national interests*, the foreign party must make a good faith effort to secure its release, § 442(2)(a) and (b). If release is not forthcoming, then

> a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

§ 442(2)(c). In other words, the party seeking the information obtains its equivalent despite foreign secrecy rules. The balancing approach of § 442(1)(c) in conjunction with the adverse inference under § 442(2)(c) means that the party caught between inconsistent obligations to two nations with equal sovereign authority is not subject to extra penalty, such as imprisonment or fines exceeding the stakes of the case. A party may lose no more than the case—and then only if the law favors the adverse party once the facts have been deemed admitted under § 442(2)(c). Such an approach is a careful accommodation of the legitimate interests of the parties and the nations alike, all without authorizing unconfined "balancing" of the "importance" of the nations' policies.

If I thought we had to do such balancing, I would be at sea. If I knew how to balance incommensurables, I would be hard pressed to agree with courts saying (as the district judge did) that a suit by the government is "more important" than private litigation. In a capitalist economy enforcement of contracts is a subject of the first magnitude. The gravity of the nation's interest is no less when it decides to enforce vital rules through private initiative. A court would need to know the "importance" of the substantive rule, which is not well correlated with the enforcement mechanism. (The antitrust laws are "more important" than the littering laws, although the former are largely enforced by private suits and the latter by public prosecutions.)

Section 442(2)(c) breaks down in a case such as this one in which the judgment has been rendered and the prevailing party seeks to discover assets. This problem, which the *Restatement* does not discuss, is closer in principle to the rule of § 442(2)(c) than to that of § 442(1). Ascertaining assets under Rule 69 is not a "sanction" for misconduct. A prevailing party is entitled to relief; so much has been determined by the judgment. At this point resort to secrecy laws does nothing but nullify the rendering nation's substantive law. Because the FSIA does not contemplate such a step, foreign secrecy laws are not sufficient to block disclosures under Rule 69.