Mohammed Radi ABDULLAH, Plaintiff,

v.

SHERIDAN SQUARE PRESS, INC., Zachary Sklar, Ellen Ray, William Schaap, Danny Mintz and National Book Network, Defendants.

No. 93 Civ. 2515 (HB).

United States District Court, S.D. New York.

April 17, 1995.

John F. McHugh, McHugh & Sherman, New York City, for plaintiff.

Melvin L. Wulf, Beldock Levine & Hoffman, New York City, for defendants.

## MEMORANDUM AND ORDER

BAER, District Judge.

This case involves a claim for libel allegedly arising from the publication of the book *Profits of War*. Plaintiff now moves for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion is granted in part and denied in part.

## I. BACKGROUND

Plaintiff Mohammed Radi Abdullah ("Abdullah"), a retired colonel of the Jordanian Army, brings this action for allegedly libelous statements that appeared in *Profits of War: Inside the Secret U.S.—Israeli Arms Network*, a book written by Ari Ben–Menashe,[1] published in 1992 by defendant Sheridan Square Press, Inc. ("Sheridan"), and thereafter distributed throughout the United States and the United Kingdom. Abdullah is a citizen of Jordan who states that he is currently seeking political asylum in the United Kingdom as a result of the publication of *Profits of War*. He complains of numerous statements in the book, including those that portray him as an informer for Mossad, the Israeli intelligence agency, a participant in PLO terrorist activities and its Black September faction, a perpetrator of the deaths of "numerous" Palestinian agents in the 1970s, the Achille Lauro hijacking in 1985, and the attempted bombing of an El Al plane in 1986, Amended Complaint at 14, ¶ 34, and an "arms merchant to Palestinian terrorist groups," *id.* at 15, ¶ 34(c).

Plaintiff acknowledges that since 1982 "[h]e has pursued a career as a manufacturer's representative selling military technology and systems to Jordan and other Arab governments on behalf of well known and respected manufacturers of such items." *Id.* at 4, ¶ 14. He asserts, however, that contrary to the book's representations, he has "never sold *small* arms to any purchaser and has never sold arms to any *non-governmental* entity, including the Palestinians." *Id.* at 15, ¶ 34(c) (emphases added). In addition, Abdullah states that, although *Profits of War* indicates otherwise, he has never "knowingly accepted funds of any kind from an Israeli source," *id.* at 16, ¶ 34(e),[2] nor been "recruited to work for any Israeli operation and has not worked with or for any Israeli organization whatsoever," *id.* at 16–17, ¶ 34(f).[3]

Abdullah alleges that the book has "defamed [him] in that he has been branded as a criminal; a terrorist; unreliable; and unqualified to continue in his profession as a trusted Arab military systems consultant and manufacturer's sales agent for respected military technology manufacturers." *Id.* at 20, ¶ 43. Moreover, claims Abdullah, the book's falsities forced him to flee Jordan, seek political asylum in the United Kingdom, and "remain in permanent exile from his homeland." *Id.* Finally, without explicitly alleging that the book caused it, Abdullah relates that he suffered a heart attack "[s]hortly after becoming aware of the allegations being made against him by the book's author." Pl.'s Mem. of L. in Supp. of Mot. for a Protec. Order at 3. While stating that his monetary damages cannot be specified "with accuracy at this time," Abdullah asserts that they exceed one hundred million dollars for the destruction of his business reputation and five hundred million dollars for his loss of personal reputation. In addition, he seeks one billion dollars in punitive damages. Amended Complaint at 21–22, ¶ 44.

While having acknowledged that the book is controversial (for example, the book jacket

---

1. Although Abdullah named Ben–Menashe in the original complaint, he failed to do so in the amended complaint, apparently due to the difficulties in locating Ben–Menashe and/or serving him with process.

2. The amended complaint includes this statement in paragraph 34(e), although due to mislabelling, it seems that the statement actually appears in what should be paragraph 34(f).

3. The amended complaint includes this statement in paragraph 34(f), although due to mislabelling, it seems that the statement actually appears in what should be paragraph 34(g).

boasts that *Profits of War* is "the book the Israelis tried to stop, written by the man they said didn't exist—the book that the CIA tried to sabotage"), defendants answered that all the statements of which Abdullah complains are true. Answer at 2, ¶ 10. Defendants then made numerous discovery requests including those seeking information concerning Abdullah's commercial armament transactions and a copy of the political asylum application he filed in the United Kingdom. At a discovery conference and in their motion papers, defendants explained that they needed the information concerning Abdullah's military transactions in order (1) to indicate the veracity of the statements concerning Abdullah's weapons deals with non-governmental entities and his acceptance of funds from certain parties, and (2) to challenge Abdullah's claims of losses to his arms business; the asylum application, they believe, among other possibilities, might indicate that Abdullah actually left Jordan for reasons other than the publication of *Profits of War*. Abdullah then made the instant motion for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, stating that disclosure of the armament information would violate Jordanian law, subject him to criminal sanctions including up to fifteen years imprisonment, violate the confidentiality provisions of the arms contracts, reveal closely held business secrets, preclude him from resuming his business by destroying his reputation for reliability in maintaining confidentiality, reveal Jordanian state secrets and the state secrets of nations allied with Jordan by indicating the nature and extent of their arms acquisitions, Pl.'s Resp. to Defs.' Interrogs. at 1–2 (the "information may allow a reader to discover classified military information [including the] type and number of armaments as well as the nature and capabilities of military technology in place in various nations of the Middle East ... disclosure [of which] would jeopardize the security of the plaintiff's nation[al] clients"), and potentially result in Abdullah's death "by assassination or by hanging," Amended Complaint at 4–5, 11. Abdullah further argued that (1) disclosing the contents of the asylum application would be embarrassing to him, and therefore potential-

ly prohibited by Rule 26(c), and (2) the application is confidential under the laws of the United Kingdom and would allegedly not be discoverable in a court proceeding there, and therefore this Court also should not order its production. Defendants, in turn, criticize what they term Abdullah's "frivolous argument that he should be able to establish necessary elements of his claim without providing defendants with materials that might prove his testimony false." Defs.' Mem. of L. in Opp'n to Mot. for a Protec. Order at 11.

## II. INFORMATION CONCERNING MILITARY TRANSACTIONS

 I note at the outset that this Court has the power to order disclosure of the requested military information in accordance with *Societe Nationale Industrielle Aerospatiale v. United States District Court*, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *see also United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir.1983) ("The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." (citations omitted)). The issue that potentially remains concerns the extent to which United States courts *should* relieve parties of discovery obligations due to their contravention of foreign law and interests. *E.g., Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat*, 122 F.R.D. 517, 522 (N.D.Ill.1988) (finding that "the Romanian interest in protecting its important secrets outweighs the American interest in providing full discovery"). In the instant case, however, I find that defendants can obtain the information they seek to adequately defend the action without necessitating disclosure of the contested information. First, insofar as the defendants seek the military transaction information for the purposes of refuting Abdullah's claims of lost business, Abdullah will be ordered to supply defendants with the total monetary values and corresponding dates of the transactions he arranged without indicating the nations' identities nor the specific items that were sold; instead, the Court will examine *in cam-*

*era* the requested information, translated into English if necessary, to ensure that the summary provided by Abdullah accurately reflects the underlying documentation. Second, in order to provide defendants with information concerning transactions involving arms sales to nongovernmental entities (or sales of *small* arms to any entity), the Court will permit defendants to examine only those documents that could arguably support defendants' statements concerning those disputed arms transactions. Third, as to Abdullah's alleged acceptance of funds from certain sources, including Israeli organizations, the Court will provide defendants with only that discovery that could arguably lend support to the truthfulness of such acceptances.

### III. CONTENTS OF POLITICAL ASYLUM APPLICATION

█ Defendants explain that in addition to potentially providing reasons for Abdullah's leaving Jordan other than merely the publication of *Profits of War,* the political asylum application may "provide[ ] details which are relevant to the claim before the Court ..., may lead to other admissible evidence that is useful to the defense ..., and may well bear on [Abdullah's] credibility." Defs.' Mem. of L. in Opp'n to Mot. for a Protec. Order at 21–22. Abdullah states that the asylum application is "sensitive" in that it "goes well beyond the facts and into his personal *fears and speculations.*" Aff. of John McHugh, Att'y for Abdullah, at 8, ¶ 14 (emphasis added). It is precisely for that reason, defendants reply, that the asylum application "may well be relevant to [Abdullah's] claims of defamation and to the facts alleged in his complaint." Defs.' Mem. of L. in Opp'n to Mot. for a Protec. Order at 21.

Abdullah next contends that the information in the application "could be extremely damaging to [him] should it reach Jordan," Aff. of John McHugh, Att'y for Abdullah, at 8, ¶ 14, because Abdullah "must assume" that his asylum application will be denied and that "he will eventually be required to return" there, *id.* at 8, ¶ 14. Those professed fears are belied by Abdullah's statements in his complaint that *Profits of War* so defamed him that he will "remain in permanent exile

from his homeland," Amended Complaint at 20, ¶ 43, because the injuries the book inflicted "are permanent [in that] no matter what [he] does or proves, no matter the weight of that proof, the accusations themselves will follow him ... forever," *id.* at 18–19, ¶ 36.

Abdullah further argues that revealing the contents of his asylum application would embarrass him in that

> [h]e has set forth in the application why he believed that his appearance in the book was, perhaps, not an accident, that his enemies at home may have had a hand in this. He has named persons he believed to be involved. He has also named British agents who investigated his charges. Such a showing of suspicion of his high placed countrymen ... would obviously be extremely damaging to a person who was, until the publication of the book, a friend and confidant of the King and a well regarded member of the royal court.

Pl.'s Mem. of L. in Supp. of Mot. for a Protec. Order at 16–17. The matters of which Abdullah exhorts nondisclosure are those that will likely be addressed throughout this litigation. Indeed, Abdullah's proffered rationale manifests yet another reason why defendants need the contents of the application: it could provide the identities and motives of Abdullah's "enemies" who might have misled defendants into unwittingly publishing falsities about Abdullah. Furthermore, the marginal impact of any potential embarrassment appears negligible in comparison to Abdullah's claimed injuries, as recited above.

Abdullah has pointed to no privilege that exempts "confidential" documents from discovery generally, let alone those designated as such by the United Kingdom. He has also failed to establish the likely occurrence of any significant embarrassment that would warrant relieving him of producing the application under Rule 26(c). Finally, his reliance on the assertion that a United Kingdom court would not order the application's disclosure is not determinative. *See Societe Nationale Industrielle Aerospatiale,* 482 U.S. at 542, 107 S.Ct. at 2555 ("We ... do not believe that an American court should refuse to make use of [Hague Evidence] Convention

[discovery] procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold."). He is therefore ordered to produce the application, although I will grant a confidentiality order, to be submitted by the parties, that will prohibit defendants from divulging its contents other than to the parties themselves and their attorneys.

## IV. CONCLUSION

Abdullah is ordered to produce the requested discovery concerning his armament transactions to the Court, which will review them *in camera* and provide defendants only with those documents that could arguably render the allegedly libelous statements detailed above true. Before turning over the documents, the Court will notify Abdullah of its findings in order that Abdullah might then take whatever action he deems appropriate, including refusing to permit their delivery and dropping certain of his claims and/or seeking a confidentiality order to preclude their dissemination. Abdullah is further ordered to execute an authorization that enables the United Kingdom to provide defendants with a copy of his asylum application. All of the above is to occur on or before Monday, May 22, 1995.

The Court will hear argument on plaintiff's Motion to Disqualify Defendants' Counsel at 9:30 A.M. on Thursday, June 22, 1995. This case remains on the Court's October 1995 Trailing Trial Calendar.

**SO ORDERED.**